IN THE SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Supreme Court |
| | ) | No. CR 98-0488-AP |
| Appellee, | ) | |
| | ) | Pinal County |
| v. | ) | Superior Court |
| | ) | No. CR 96-021235 |
| ARTURO ANDA CAÑEZ, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |


Appeal from the Superior Court of Pinal County
Honorable Boyd T. Johnson, Judge

**AFFIRMED IN PART; REVERSED IN PART**

_____


Janet A. Napolitano, Attorney General                    Phoenix
  by  Paul J. McMurdie, Former Chief Counsel,
        Criminal Appeals Section
     Kent E. Cattani, Chief Counsel,
        Capital Litigation Section
        Joseph T. Maziarz, Assistant Attorney General,
        Criminal Appeals Section
Attorneys for Appellee


Thomas J. Phalen                                          Phoenix
     and
Tara K. Allen                                            Tempe
Attorneys for Appellant

_____

**J O N E S, Chief Justice**

¶1 A jury convicted Arturo Anda Cañez of first degree felony murder, first degree burglary, and two counts of armed robbery. The trial court's imposition of the death penalty on the murder conviction resulted in this direct appeal pursuant to Rules 26.15 and 31.2(b) of the Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to article VI, section 5(3) of the Arizona Constitution and section 13-4031 of the Arizona Revised Statutes.

**FACTS**

¶2 Near midnight on February 22, 1996, a neighbor saw a truck matching the description of Cañez' at the Casa Grande home of 77-year-old Franklin Joseph Hale. The driver spoke amiably with Hale for about five minutes. When the truck left, the neighbor heard its gears grinding.

¶3 The following night, sometime after 7:00 p.m., Cañez drove his truck into the parking lot of a bar in Casa Grande. Jerry Livingston lived in a camper in the parking lot, and he and Donna Thacker were sitting outside the camper drinking beer. Cañez joined them and asked if they wanted to get some crack cocaine. As they sat drinking and smoking, Cañez used a flip-top lighter with a marijuana leaf printed or etched on it to light his cigarette. Kathy Shepard soon joined the group. They put their money together, and Cañez and Shepard left to buy cocaine. The two bought $20 of crack cocaine and smoked it between themselves.

2

Cañez used the marijuana leaf lighter to smoke the cocaine. After smoking all of the cocaine, Shepard had Cañez drop her off two blocks from the bar and instructed Cañez to tell Livingston that they had "gotten ripped off" to "cover up" for not sharing the cocaine with him. By the time Shepard walked back to Livingston's camper, Cañez was already there. Shepard told Livingston that they "got burnt."

¶4        Cañez, Thacker, and Shepard then left the bar in Cañez' truck. They bought more cocaine and drove to a barn frequented by drug users and the homeless, arriving between 9:00 and 10:00 p.m. There they met co-defendant Brian Patterson who was living in the barn as its caretaker. Patterson recognized Thacker and Shepard from having previously used drugs with them in the barn. Cañez introduced himself to Patterson as Anda. The four of them divided the cocaine and smoked it.

¶5        Afterward, Cañez told Shepard that he "was going to do a job" and get some money from an old man toward Selma Highway. He suggested that Shepard "turn a trick" with the man while Cañez took his money and guns. Shepard declined but Cañez persisted. Cañez then suggested that they lure Patterson out of the barn and take his wallet from under his bed. Again Shepard refused.

¶6        Shepard drove Thacker and Cañez in Cañez' truck to get more cocaine. They bought another $40 worth, returned to the barn, and smoked it. Cañez, Thacker, and Shepard again left to buy

cocaine. Shepard had become leery of Cañez and his insistence on going to the old man's house and decided to get away from him. With the money, Shepard got out of the truck to buy the drugs, hinting that Thacker should come with her, but Thacker did not. At the drug house Shepard met a man she knew and left with him. Cañez wanted his money back, but Thacker said Shepard would not be coming back. Cañez dropped Thacker off at her friend's trailer and returned alone to the barn.

¶7        Upon his return, Cañez told Patterson they had been ripped off and asked where they might find the women. They got in the truck to look for them at the bar. On the way, Cañez asked Patterson whether he could fight and he said no. Patterson was then 23 years old, 6' 1", and weighed 125 pounds. He suffered from walking pneumonia, drug use, and heart problems, for which he had undergone seven operations and required a pacemaker. They found neither Thacker nor Shepard at the bar. Cañez then drove to Hale's house, grinding the gears as he went. En route, Cañez spoke of beating someone up and taking his money. When they arrived, Patterson remarked that it was "too broad a view," but Cañez said, "Don't worry. This guy lives by himself and there's nobody around who will notice."

¶8        Hale answered the door and Cañez said, "Hey, Pops, you got some more money, another twenty." Patterson had the impression they knew each other. Cañez pushed Hale back into the house and

4

closed the door behind him.  From outside, Patterson could hear scraping and thumping.  Cañez opened the door and said, "It's taken care of, come on in."  Patterson stepped over Hale's "squirming" body as he entered the house.  At Cañez' direction, Patterson put Hale's television in the truck.  On his way back he saw Cañez twisting a white cloth around Hale's neck.  Patterson turned and walked away, but Cañez came to the door and threatened him to "get back in the house."  When Patterson went back inside, Hale was still moving on the floor.

¶9     Cañez and Patterson emptied the contents of a wallet onto a chair.  On a stand next to the chair, Patterson saw a closed folding knife.  Cañez sent Patterson into the bedroom to look for guns.  From the bedroom doorway, Patterson saw Cañez strike Hale in the head several times with a frying pan.  Patterson saw a glove on the hand wielding the frying pan but did not see whether the other hand wore a glove.  Hale was still moving and appeared to Patterson to be semi-conscious.  Cañez and Patterson carried out a stereo and speakers.  On his way out for the last time, Patterson saw Hale moving his right arm toward his head as Patterson stepped over him.  After putting the stereo in the truck, Cañez went back into the house for two or three minutes and came out with an electric razor case.  They left Hale's house with the truck's lights off.  Again, Cañez had trouble shifting gears.

5

¶10     At about 12:45 a.m. a neighbor saw a truck backing out of Hale's driveway with its lights off. There appeared to be two people in the truck. The truck drove to the end of the street and hesitated at the stop sign for 30 seconds before turning the lights on and speeding away. At trial, the neighbor identified the truck as Cañez'.

¶11     Marco and Marta Ramirez testified that Cañez, whom they knew by sight from the neighborhood, came to their trailer between midnight and 1:30 a.m. Cañez offered to sell them a television and stereo. Cañez' clothes were wet, dark, and dirty, which he attributed to his having been in a fight. Cañez asked for $50 for the property but accepted $20 because he "needed the money."

¶12     In the truck after the sale, Patterson said, "He better not die." Cañez replied, "He ain't gonna die. He ain't gonna die. He ain't gonna die." Cañez then drove around the block from the Ramirez residence and parked in front of a trailer he said belonged to his cousin. He went inside with the electric razor and came out 15 minutes later, cleaned up and wearing different clothes. They then drove around Casa Grande in a fruitless search for cocaine. Cañez picked up a woman Patterson did not know and then dropped Patterson off near the barn. Half an hour later, Cañez and the woman came back to the barn. Cañez asked whether Patterson had seen his lighter, but Patterson said he had not. After smoking more cocaine, Cañez and the woman left.

6

¶13     In the early afternoon of the following day, Hale's son discovered the body.  The medical examiner determined that Hale died as a combined result of 21 blunt force injuries and six stab wounds.  That afternoon, Patterson learned from his friend, Justin McIntosh, whom he had told of the robbery, that the victim had died.  The two went to a pay phone where Patterson called a mental counseling service and told the counselor that he had been involved in a homicide.  The counseling service called the police and they met Patterson and McIntosh at the pay phone.  Patterson agreed to go to the station and make a statement.

¶14     Initially, Patterson denied witnessing the assault or taking drugs, but later admitted to seeing some of the beating and carrying out the speakers.  He agreed to show the detectives where he had been with Cañez the night before.  Patterson took the detectives to Hale's house, the Ramirez trailer, the barn, and the trailer where Cañez had changed clothes (which turned out to be Cañez' residence).  He also identified Cañez' truck parked in front of the trailer where Cañez had changed.

¶15     On March 7, 1996, a grand jury indicted Arturo Anda Cañez and Brian D. Patterson of first degree felony murder, first degree burglary, and two counts of armed robbery.  Patterson cooperated with the investigation and testified at Cañez' trial pursuant to a plea agreement for manslaughter and first degree burglary.  Patterson ultimately received a ten-year sentence.  Cañez' trial

began January 21, 1998, and on February 5, 1998 the jury returned guilty verdicts on all charges.  He was sentenced to death on October 27, 1998.

## TRIAL ISSUES

### I.  *BATSON* CHALLENGE

¶16      Cañez, who is Hispanic, made a *Batson* challenge based on the state's removal of five of the seven Hispanic members of the jury pool.  *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  The judge found that this met the defendant's burden of establishing a prima facie case of discrimination and asked the state to explain its strikes.  The court ruled that the reasons offered by the state were race-neutral and denied the *Batson* challenge.  Cañez contends that this was error and challenges the following juror strikes:

¶17      Perea – The state was concerned that, because she knew one of the state's witnesses, Perea might bring unfavorable extra-judicial information about his controversial employment history into deliberations.  The trial judge, a friend of the witness, knew of this employment history.  Cañez argued that nothing in the record supported the alleged spotty employment history or that Perea knew of it.  This strike gave the trial judge some pause since he did not share the state's concerns.  However, he found the explanation race-neutral.

¶18      Duran – The state struck this juror because she was 21 years old, had only twelve years of education, and, most

8

importantly, claimed to be a nurse. The prosecutor believed that someone of her age and education could not be a nurse and that her candor was thus called into question. The court thought she could have received a two-year nursing degree (although she had not claimed it on the questionnaire), but found that the concern regarding candor was race-neutral. Cañez argued that this reason was pretextual since the state had not asked follow-up questions to clarify her employment. Although the court believed she would be a good juror, it upheld the strike as race-neutral.

¶19        Ibarra – The prosecutor had had a close and rocky working relationship with Ibarra's brothers who worked in law enforcement. Two of the brothers had been prosecuted for felonies, and there was some sentiment that this prosecutor's office, though it did not handle the case, chose not to prevent the prosecutions. Ibarra was struck out of fear of hostility toward the prosecutor. The trial judge knew that the prosecutor's office had made the referral that resulted in the prosecutions and that at least some of the Ibarra family held the office responsible. Cañez points out that nothing on the record supports the claimed hostility and that other jurors with relatives who had brushes with the law were not struck. The trial court permitted the strike as race-neutral.

¶20        Salazar – The state struck Salazar because he had a criminal history and expressed his dislike of the death penalty. The state said it was not convinced by the court's rehabilitation

9

of the juror regarding the death penalty. The court noted not only Salazar's difficulty with the death penalty, but also his inconsistent answers to questions generally. Cañez points out that Salazar stated that he could set aside his feelings about the death penalty and be a fair and impartial juror. The court found the strike nondiscriminatory.

¶21 Armenta – This juror was struck because he had a criminal history and did not think it fair for the government to offer co-defendants plea agreements in exchange for testimony. Cañez points out that the juror said he could be a fair and impartial juror and that no co-defendants testified against Armenta in his own conviction. The court found the strike race-neutral.

¶22 *Batson* challenges are governed by a three-step analysis: (1) the party challenging the strikes must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination. *Purkett v. Elem*, 514 U.S. 765, 767 (1995).

¶23 The state argues that our analysis should end with step one because the trial court erroneously found a prima facie showing of discrimination. The state contends that, as a matter of law, a prima facie case cannot be established where only some, but not all, members of a cognizable group are struck. However, although

10

"the fact that the state accepted other Hispanic jurors on the venire is indicative of a nondiscriminatory motive," it is "not dispositive." *State v. Eagle*, 196 Ariz. 27, 30, 992 P.2d 1122, 1125 (App. 1998) (citing *Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997) (presence of minority jurors does not preclude successful *Batson* challenge)).  Because the trial court did not abuse its discretion in finding a prima facie case of discrimination, we proceed to step two of the analysis.

¶24      Cañez asserts that the trial court erred in finding that the state carried its burden of providing race-neutral reasons for the strikes.  Relying on our decision in *State v. Cruz*, he argues that where "the state offers a facially neutral, but wholly subjective, reason for a peremptory strike, it must be coupled with some form of objective verification" in order to satisfy step two of the *Batson* analysis.  175 Ariz. 395, 399, 857 P.2d 1249, 1253 (1993).

¶25      The *Cruz* rule has been called into question by the Supreme Court's subsequent holding that an explanation need only be facially race-neutral, not "persuasive, or even plausible." *Purkett*, 514 U.S. at 768.  Although the court of appeals has held that *Purkett* "eliminate[d] the *Cruz* requirement," *State v. Henry*, 191 Ariz. 283, 286, 955 P.2d 39, 42 (App. 1997), we have not addressed its impact.  *See State v. Trostle*, 191 Ariz. 4, 12, 951 P.2d 869, 877 (1997) (declining to reexamine the continued validity

11

of *Cruz* in light of *Purkett*); *State v. Murray*, 184 Ariz. 9, 25, 906 P.2d 542, 558 (1995) (assuming, without deciding, that *Cruz* was not diluted by *Purkett*).

¶26    We do not address the impact of *Cruz*, if any, on today's opinion because *Cruz* appears not to have survived *Purkett*.  But even had it survived, it would not aid Cañez in the case at bar. *Cruz* requires only objective verification for wholly subjective explanations.  Here, four of the five challenged strikes were based on objective facts.  Perea knew one of the state's witnesses. Duran claimed employment as a nurse, yet was young and did not report any post-secondary education.  Salazar's criminal history and dislike of the death penalty appear in the record.  Similarly, Armenta had a criminal history and held a dim view of exchanging plea agreements for co-defendant testimony.  The *Cruz* rule is inapplicable because objective facts supported each of these strikes.

¶27    The fifth strike, Ibarra, was based on an apparently subjective belief that the Ibarra family harbored ill feelings toward the prosecutor's office.  The trial judge provided objective verification for this strike by stating on the record that he knew of the Ibarra family's problems with and resentment toward the prosecutor's office.  *See Cruz*, 175 Ariz. at 399, 857 P.2d at 1253 (noting trial court's observations as one source of objective verification).  Thus, each of the challenged strikes easily

12

satisfied *Cruz*, and, even if its rule survives *Purkett*, its application would not change the result here.

¶28    In step three, the trial court ruled against Cañez' challenge, implicitly finding that he had not carried his burden of proving purposeful discrimination in any of the state's peremptory strikes.  We give great deference to the trial court's ruling, based, as it is, largely upon an assessment of the prosecutor's credibility.  *See Batson*, 476 U.S. at 98 n.21.  The trial court upheld each strike, and we find no error, much less the clear error required to disturb such rulings.  *See Murray*, 184 Ariz. at 24, 906 P.2d at 557.

## II.   DEATH QUALIFIED JURY

¶29    Cañez argues that the removal of jurors Smith and Salazar due to their feelings on the death penalty deprived him of his rights to an impartial jury, a fair trial, due process, and equal protection.  As to Salazar, Cañez' claim fails as a matter of law since the state removed him with a peremptory strike.  "Parties may . . . exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review."  *J.E.B. v. Alabama*, 511 U.S. 127, 143 (1994).  "Nothing about a person's views on the death penalty invokes heightened scrutiny under the Equal Protection Clause. Thus, *Batson* does not limit the use of peremptory challenges to exclude  jurors  because  of  their  reservations  about  capital

13

punishment." *State v. Bolton*, 182 Ariz. 290, 302, 896 P.2d 830, 842 (1995).

¶30     As to Smith, Cañez contends that she should not have been dismissed for cause because she did not unequivocally state that she could not be a fair and impartial juror.  In support of this argument, Cañez relies upon *State v. Anderson,* in which we held that the trial court committed reversible error by not allowing oral voir dire in order to rehabilitate jurors with ambiguous reservations about their ability to be fair in light of their views on the death penalty.  197 Ariz. 314, 319, 4 P.3d 369, 374 ¶10 (2000).  The state argues that *Anderson* was incorrectly decided and urges us to reconsider its holding.  We decline the request but point out that, on the record before us, we need not address *Anderson* because here, oral voir dire *was* conducted; Cañez simply disagrees with the resulting ruling.  When the trial judge removed Smith, Cañez made no objection.  Thus, we review only for fundamental error.

¶31     Both the court and defense counsel attempted to rehabilitate Smith by explaining to her that the sentencing decision was for the judge alone. Her responses were inconsistent, but she ultimately said that she would be incapable of fairly determining guilt and thereby subjecting the defendant to a possible death sentence.  The "trial judge must excuse any potential jurors who cannot provide assurance that their death

14

penalty views will not affect their ability to decide issues of guilt." *State v. Kayer*, 194 Ariz. 423, 432, 984 P.2d 31, 40 ¶27 (1999). Smith did not provide such assurance and was therefore properly excluded for cause.

### III. JURY CONTAMINATION

¶32    By failing to raise them at trial, Cañez has waived all three of his jury contamination arguments. Thus, we review only for fundamental error. Juror prejudice will not be presumed but must be demonstrated by objective evidence. *See State v. Doerr*, 193 Ariz. 56, 61-62, 969 P.2d 1168, 1173-74 ¶18 (1998). All three claims fail for lack of evidence of resulting prejudice.

¶33    First, Cañez argues that the jury was contaminated by a venire member's statement that his sister had been the victim of a home invasion rape by an African-American and that he would therefore have a problem serving if the defendant were black. Cañez suggests that, since he too was a minority accused of a home invasion attack upon a Caucasian, the juror's admission of racism against blacks prejudiced the rest of the jurors against him, an Hispanic defendant. Though this juror was ultimately removed, Cañez argues that the court should have questioned the rest of the jurors to ensure that they were not prejudiced by the statement.

¶34    In support of this argument, Cañez relies on *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1998). During voir dire, a potential juror repeatedly informed the judge and the panel that

15

she, as a social worker, had substantial expertise in the area of sexual abuse of children, that she had never been involved in a case of alleged sexual abuse against a child where the child's statements had not been borne out, and that she had never known a child to lie about sexual abuse. *Id.* at 632-33. The appellate court explained that, given the potential juror's experience and conviction, "we presume that at least one juror was tainted and entered into jury deliberations with the conviction that children never lie about being sexually abused." *Id.* at 633. The appellate court found that the potential juror's statements were intrinsically prejudicial and resulted in the swearing in of a tainted jury because the nature of the statements dealt with the defendant's guilt and the victim's truthfulness, the statements were "expert-like," were delivered with certainty, and were repeated several times.

¶35 Second, while in the restroom, a juror overheard a member of the victim's family say to a third person, "I hope they don't believe her." She reported the encounter to the court, and the judge and counsel interviewed her about it. She did not know who the speaker was talking about or whether the comment pertained to the case, but indicated that she thought they may have meant the next witness, who was female. The court kept the juror but did not admonish her not to tell the other jurors of the comment. Cañez did not object or suggest an admonition. Here too, Cañez has

16

failed to demonstrate any resulting prejudice, and none is apparent.

¶36 Third, a Spanish-fluent juror talked to the court interpreter during a break. The prosecutor brought the conversation to the court's attention. At Cañez' request, the court questioned the juror about the discussion. The juror told the court that their talk did not concern the case and that he could be a fair and impartial juror. Both attorneys declined to question the juror. The court reminded the juror not to talk with staff until the trial ended. Cañez did not object, nor did he request any other action of the court. There is no indication of prejudice.

## IV. REFUSED JURY QUESTIONNAIRE

¶37 Cañez argues that the court abused its discretion in refusing to permit his 82-question voir dire questionnaire. Written questionnaires have been approved by this court and are recognized by the Rules of Criminal Procedure. Ariz. R. Crim. P. 18.5(d). Nevertheless, questionnaires are not required. The method and scope of voir dire is left to the discretion of the trial judge. *State v. Detrich*, 188 Ariz. 57, 64-65, 932 P.2d 1328, 1335-36 (1997). "We will not disturb the trial court's selection of the jury in the absence of a showing that a jury of fair and impartial jurors was not chosen." *State v. Walden*, 183 Ariz. 595, 607, 905 P.2d 974, 986 (1995) (internal quotations omitted)

17

(quoting *State v. Tison*, 129 Ariz. 546, 551, 633 P.2d 355, 360 (1981)), *rejected on other grounds by State v. Ives*, 187 Ariz. 102, 107-08, 927 P.2d 762, 767-68 (1996). The trial court expressly encouraged counsel to conduct extensive individual oral voir dire, including in chambers if necessary. The trial court did not abuse its discretion.

## V.   INSUFFICIENT EVIDENCE

### A.   Murder

¶38     Cañez argues that the trial court erred by denying his motion for a directed verdict of acquittal due to a lack of sufficient evidence to convict. To determine whether a rational jury could convict, we assess the admissible evidence in the light most favorable to sustaining the verdict. *State v. Fulminante*, 193 Ariz. 485, 493, 975 P.2d 75, 83 ¶24 (1999).

¶39     Cañez' principal argument is that the value of Patterson's testimony is slight, given that:  two other inmates testified he made statements about being offered a "sweet deal" for testifying against Cañez in a murder Patterson actually committed; Patterson agreed to testify in exchange for a lesser sentence; Patterson had a motive to commit the crime because he was destitute and without drugs; prior to the murder, Patterson had been depressed and suicidal; while incarcerated, Patterson wrote letters to the court asking that he be put to death for his involvement; at trial, Patterson had limited present recollection of the night of

18

the murder or of his statements to police; and prior to trial, Patterson submitted an affidavit recanting his identification of Cañez. However, the credibility of witnesses is a matter for the jury. *Estate of Reinen v. Northern Ariz. Orthopedics, Ltd.*, 198 Ariz. 283, 287, 9 P.3d 314, 318 ¶12 (2000). Cañez presented all of the above impeachment evidence to the jury for its use in weighing Patterson's testimony.

¶40 In light of our holding that the Ramirezes' testimony was not purchased, *infra,* Purchased Testimony at ¶72, we do not address Cañez' contention that their testimony was unreliable because the state obtained it with the promise of helping them secure preferential treatment from the Immigration and Naturalization Service.

¶41 Cañez also points to the substantial lack of physical evidence. No fingerprints were found on the stolen property, nor did the property appear to have been wiped off. However, co-defendant Patterson testified that Cañez was wearing at least one glove during the assault. None of Cañez' hair was found at the scene. None of his shoes matched a print found at the scene. The tires on his truck, though consistent with tracks at the scene, could not be definitively matched. No bloody clothes were found at Cañez' home or in his truck. No blood was found in Cañez' truck. None of Cañez' blood was found at the crime scene. The only physical evidence recovered from the scene linking Cañez to the

19

murder was his lighter which, although a detective testified to having noticed it on the first processing, was not noted, photographed, or recovered until the second processing two days later.

¶42        Physical evidence is not required to sustain a conviction where the totality of the circumstances demonstrates guilt beyond a reasonable doubt. *Fulminante*, 193 Ariz. at 494, 975 P.2d at 84 ¶26.   The jury heard eyewitness testimony from co-defendant Patterson that Cañez attacked Hale and removed property from his home.   A neighbor identified Cañez' truck leaving Hale's house on the night of the murder.   Tire tracks consistent with those made by Cañez' truck were found at the scene.   The Ramirezes testified that they bought the stolen property from Cañez on the night of the murder.   A lighter seen in Cañez' possession on the night of the murder was found at the crime scene.   Several witnesses testified to riding in or seeing Cañez drive his truck on the night of the murder, contradicting Cañez' statements to police that he was home that night and that the truck never moved because it was not licensed and he could not drive a manual transmission.   Finally, Cañez was heard to say that he planned to "do a job" and take some money from an old man.

¶43        The trial court did not err in denying Cañez' motion for a directed verdict.   There was ample evidence which "reasonable persons could accept as adequate and sufficient to support a

20

conclusion of defendant's guilt beyond a reasonable doubt." *State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980).

### B. Two Counts of Armed Robbery

¶44     Cañez next argues that the evidence cannot support two counts of armed robbery, one with a knife and one with a frying pan. He contends that although he allegedly attacked Hale with different weapons and took various pieces of his property, there was only one continuous course of conduct and thus only one armed robbery. The state points out that defendant pushed his way into the house, attacked Hale, and removed property from the house to his truck. He then left the truck, went back into the house, attacked Hale with another implement, and took additional property. The state concludes that two takings with two weapons, although having a common victim, constitute two armed robberies.

¶45     The trial court reserved judgment on this issue when Cañez raised it at the close of the state's case. It does not appear to have been called to the court's attention a second time, except perhaps as an implicit element of Cañez' blanket motion for dismissal due to insufficient evidence made prior to closing arguments. Therefore, the trial court apparently never expressly decided whether two counts of armed robbery were proper on these facts.

¶46     We find only one count of armed robbery appropriate. First, both takings and attacks occurred within the same course of

21

conduct. The fact that Cañez interrupted the offense to take some of the stolen property to his truck will not give rise to an additional count. Second, robbery will lie only where the defendant "threatens or uses force . . . with intent either to coerce surrender of property or to prevent resistance." A.R.S. § 13-1902(A). Given the totality of circumstances, this happened only once, even though Cañez was in and out of the residence. The entries occurred within minutes of each other and the victim was the same each time. Cañez did not leave the property until his crimes were complete. Accordingly, we reverse the conviction and sentence on Count III, the second allegation of armed robbery.

## VI. SUGGESTIVE IDENTIFICATION PROCEDURE

¶47 The only witness to the commission of the crimes at issue was co-defendant Patterson. Cañez argues that the trial court committed reversible error in admitting Patterson's pretrial and in-court identifications of Cañez. Patterson, who met Cañez for the first time on the night of the murder, identified him as the murderer from a single photograph provided by the police. Single person identifications are inherently suggestive. *State v. Williams*, 144 Ariz. 433, 439, 698 P.2d 678, 684 (1985). However, even where the pretrial identification procedure is unduly suggestive, reliable identifications will be admitted. *Id.* at 439-40, 698 P.2d at 684. We assess an identification's reliability using the *Biggers* factors: (1) the witness' opportunity to view,

22

(2) the witness' degree of attention, (3) the accuracy of the description, (4) the witness' certainty, and (5) the time between crime and confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

¶48     Patterson had an ample opportunity to view Cañez, having spent several hours in his actual presence before, during, and after the murder, including in close proximity while in the pickup truck and while sharing drugs.   Cañez commanded Patterson's undivided attention, both during the attack and when they talked alone before and after.  Patterson provided a detailed description, which included a distinctive tattoo and identifications of Cañez' truck and residence.    Patterson was "very certain" of his identification of Cañez' photo.   Finally, the identification was made less than two days after the crime.  All five *Biggers* factors indicate reliability.  Weighing against this is the fact that he was shown only one photograph and asked, "Is this the guy who did this?" or "Do you recognize this person?"  We find Patterson's identification wholly reliable, despite the suggestive pretrial identification procedure.  Therefore, the trial court did not err in admitting it.

VII. **ADMISSION OF CAÑEZ' STATEMENTS TO POLICE**

¶49     Cañez argues that his statements to police following his arrest should not have been admitted.  The jury heard an edited and redacted copy of the tape recorded interview, and the interviewing

23

officer testified as to its substance. Cañez claimed to have been home on the night of the murder. He also said that his truck was never driven because he could not drive a manual shift vehicle and because the truck was unlicensed and had a hole in the windshield. Cañez' inability to drive a manual shift was corroborated by several witnesses. His denial that he drove his truck was contradicted by at least five witnesses, three of whom rode in the truck with Cañez on the night of the murder.

## A. Warrantless Arrest

¶50 When the police went to Cañez' residence to arrest him, they had neither a search warrant nor an arrest warrant. Cañez' wife answered the door, and the officers asked to see Cañez. When he did not appear promptly, two officers followed Cañez' wife into the house without her objection or express permission. The officers told Cañez he needed to come outside and talk to them. Once outside, they formally placed Cañez under arrest for first degree murder.

¶51 Cañez argues that because his arrest was illegal, his subsequent statement to the police should not have been admitted. Because Cañez raises this issue for the first time on appeal, we review only for fundamental error. The alleged illegality arises from the fact that the police arrested Cañez in his home and without a warrant. The state asserts, in a footnote without authority or argument, that Cañez' constitutional claims fail

24

because: (1) Cañez' wife implicitly consented to the officers' entry; (2) Cañez was not arrested in his home; (3) there were exigent circumstances; and, (4) the taint from any violation was attenuated. These issues could be deemed abandoned by the state's failure to argue them. Ariz. R. Crim. P. 31.13(c)(1)-(2); *State v. Blodgette*, 121 Ariz. 392, 395, 590 P.2d 931, 934 (1979). Nevertheless, because we are obliged to uphold the trial court's ruling if legally correct for any reason, we address each of the state's contentions. *State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984).

¶52 The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures." Because the invasion of the home is the chief evil to be prevented by the Fourth Amendment, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585-86 (1980). In addition, Arizona's Constitution protects the home from official intrusion without lawful authority. ARIZ. CONST. art. 2, § 8. Therefore, warrantless entries of the home are *per se* unlawful absent exigent circumstances or other clear necessity. *State v. Bolt*, 142 Ariz. 260, 265, 689 P.2d 519, 524 (1984). Any evidence obtained as a result of such illegal searches and seizures is generally inadmissible at trial, pursuant to the exclusionary rule. *See Mapp*

*v. Ohio*, 367 U.S. 643 (1949); *Bolt*, 142 Ariz. at 269, 689 P.2d at 528.

¶53    First, although the constitutional protections of the home can be voluntarily waived, the record does not support the state's contention that Cañez' wife consented to the entry. *See State v. Schad*, 129 Ariz. 557, 563, 633 P.2d 366, 372 (1981). "In determining whether or not there was a consent, it is necessary that such a waiver or consent be proved by clear and positive evidence in unequivocal words or conduct expressing consent . . . ." *State v. Kananen*, 97 Ariz. 233, 235, 399 P.2d 426, 427 (1965). At the pretrial voluntariness hearing, one of the detectives who entered the house was asked, "Did she invite you in?" He answered, "She never said the words come in, I said something about coming in, she turned and walked back into her house and I followed her in." This is not the unequivocal consent required to permit police entry into the home.

¶54    Second, we find that Cañez was seized, for Fourth Amendment purposes, when the officers confronted him in his bathroom. "[T]he test is whether, in light of all the circumstances, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *State v. Wyman*, 197 Ariz. 10, 13, 3 P.3d 392, 395 ¶7 (App. 2000) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). A reasonable person,

26

confronted in the bathroom of his own home by two police officers advising him that he "needed to come outside," would not feel free to go about his business. Therefore, contrary to the state's assertion, Cañez was arrested in his dwelling.

¶55 Moreover, absent permission or exigent circumstances, officers may not enter a home without a warrant. *Bolt*, 142 Ariz. at 265-66, 689 P.2d at 524-25. Therefore, whether Cañez was arrested when the officers came into his bathroom and asked him to come outside to talk with them, or whether he was not under arrest until he went outside and was formally arrested and handcuffed, is of little importance. In either event, the officers unlawfully entered his residence and any evidence obtained thereby was subject to suppression.

¶56 Third, while it claims there were exigent circumstances sufficient to justify the warrantless entry and arrest, the state has not suggested what those circumstances might have been. Though not an exhaustive list, we have recognized the following exigent circumstances: response to an emergency; hot pursuit; potential destruction of evidence; potential violence; and flight. *State v. White*, 160 Ariz. 24, 32-33, 770 P.2d 328, 336-37 (1989). Here, there was no emergency or pursuit. There may have been some worry of violence, flight, or destruction of evidence since Cañez was suspected of murder. However, the absence of a warrant exacerbated any such fears because the delay between the entry and the police

27

alerting Cañez to their presence and their entry gave Cañez time to prepare for resistance, flight, or the destruction of evidence. This case is factually similar to *State v. Ault* in which the police had probable cause to arrest but did not obtain a warrant before entering the defendant's home and seizing him. 150 Ariz. 459, 724 P.2d 545 (1986).

> [T]he deputies chose not to legally arrest defendant at his home . . . . The exigent circumstances alleged on behalf of the state were created by the arresting deputies. An arrest warrant could have been obtained and defendant apprehended at his home. This was not done.
>
> . . . .
>
> [W]e cannot allow the creation of exigent circumstances in order to circumvent the warrant requirement.

*Ault*, 150 Ariz. at 463, 724 P.2d at 549. The same reasoning applies here to rule out an exigent circumstances justification for the warrantless entry and arrest.

¶57 Finally, the state contends that even if the entry and arrest were illegal, the taint on Cañez' statement was sufficiently attenuated that it should not be excluded as the fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). The Supreme Court has addressed this question under nearly identical circumstances. It held that where the police have probable cause to arrest, but violate the defendant's Fourth Amendment rights by doing so in his home and without a warrant, subsequent statements made "at the station house" are *not* fruits of the illegal arrest. *New York v. Harris*, 495 U.S. 14, 20 (1990)

28

("[T]he statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else."). Here, the state did not obtain incriminating evidence as a result of the arrest being effected illegally in Cañez' home rather than legally elsewhere. Therefore, because Cañez' statement was made subsequently and voluntarily at the police station, it was not tainted by the illegal entry and arrest. Accordingly, the trial court did not err in admitting it.

### B. *Miranda* Warning

¶58　　　　Cañez also argues that his statement to the police should have been suppressed because it was obtained without a valid waiver of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The interview began with the following exchange between Cañez and the lead investigator, Detective Hercel Merchant.

> Det. Merchant: Ok. Before we start, go any further ah, I wanna read you your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer, one will be appointed to represent you before any questioning if you wish. Do you understand each of these rights? You're going to have to say yes or no. Yes? Ok. Ah, are you willing to talk to me?
>
> Cañez: Well, like I say, I don't know what you're talking about.
>
> Det. Merchant: I told you, it's about . . .
>
> Cañez: Ah . . .
>
> Det. Merchant: that case. I would like for you . . .

29

Cañez: You can ask me, you, whatever you want and I'll, you know, I'm, I'm gonna tell you the truth man ah, ah, where I've been at, you know.

After a hearing, the court found the statement voluntary and admissible. Such rulings will be disturbed on appeal only upon a finding of clear and manifest error. *State v. Prince*, 160 Ariz. 268, 272, 772 P.2d 1121, 1125 (1989).

¶59     Cañez argues that he never stated that he understood or waived his rights. However, *Miranda* rights are waived by conduct where, as here, the defendant answers questions following *Miranda* warnings. *State v. Tapia*, 159 Ariz. 284, 287, 767 P.2d 5, 8 (1988). Merchant's question and inferred answer ("Yes? Ok.") suggest that Cañez indicated he understood his rights. In addition, Cañez expressly consented to questioning and assured Merchant that he would answer truthfully. This is sufficient to uphold the trial court's ruling under the manifest error standard. Furthermore, Cañez does not point to any evidence that he was incapable of understanding the warnings provided. In addition, the fact that the defendant had significant experience with the criminal justice system suggests that he understood his rights. *See id.* The trial court's ruling was not clearly erroneous.

### C. Rule 403

¶60     Cañez also argued at trial that even if the substance of his statement was otherwise admissible, it should not have been presented to the jury by audiotape. He objected to the tape on the

30

ground that the state's only reason for playing it was to prejudice the jury by showcasing his thick accent, poor grammar, limited education, and cocky, nonchalant attitude. He contends that the danger of unfair prejudice in these respects substantially outweighed the tape's probative value. Ariz. R. Evid. 403(b). Cañez relies heavily upon the argument that the substance of the interview could have been presented by other means, such as the transcript or the interviewing officer's testimony. The state counters that the tape provided the best evidence of what Cañez said and how he said it.

¶61 Because the trial court is best situated to conduct the Rule 403(b) balance, we will reverse its ruling only for abuse of discretion. *State v. Roscoe*, 184 Ariz. 484, 493, 910 P.2d 635, 644 (1992). We conclude, however, that it would require a rare case for the defendant's own statement to be seen as prejudicial to the extent it should be excluded under Rule 403. This is not that case. Moreover, because the jury's credibility determination would be aided by hearing Cañez' demeanor, the tape clearly had substantial probative value. The trial court's resolution of the issue was reasonable. We find no abuse of discretion.

## VIII.    LIMITED CROSS-EXAMINATION

¶62 Cañez argues that the trial court violated his constitutional right to confront the witnesses against him by limiting his cross-examination of co-defendant Patterson. "[T]rial

31

judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also State v. Fleming*, 117 Ariz. 122, 125, 571 P.2d 268, 271 (1977) ("The right to cross-examination must be kept within 'reasonable' bounds and the trial court has discretion to curtail its scope."). We evaluate cross-examination restrictions on a case-by-case basis to determine whether the defendant was denied the opportunity to present evidence relevant to issues in the case or the witness' credibility. *Fleming*, 117 Ariz. at 125, 571 P.2d at 271.

¶63 Prior to trial, the defense interviewed Patterson extensively concerning his drug use since age nine. The state filed a motion in limine to restrict cross-examination with respect to such prior bad acts under Rule 608(b), Arizona Rules of Evidence. The trial court partially granted the motion, ruling that though defense counsel could not "start with him as a child and go through his history using drugs," cross-examination would be permitted on his regular usage, the extent and effect of his use the night of the murder, and his potential motive to commit these crimes in order to buy drugs. The trial court found Patterson's more remote drug use irrelevant and unduly prejudicial.

¶64      Cañez contends that his inability to delve into Patterson's full drug history deprived him of his right to impeach the witness and present his defense that Patterson had a motive to commit the crimes.  We disagree.  The trial court expressly permitted cross-examination on motive.  The court also allowed questioning concerning Patterson's habitual drug use.  Defense counsel elicited from Patterson his usual drug use, his drug use the night of the murder and the following day, his poor financial circumstances, his inability to acquire drugs in the few days before the murder, his purchase the next day of $20 of marijuana, and his unclear and incomplete memory of much of the night.  The trial court only precluded questioning as to historical, "specific instances of drug use and the length of time."  Despite this restriction, Cañez was permitted to elicit facts necessary to support his theory that Patterson was a drug addict in need of money to support his habit.  We find that the limits upon cross-examination were entirely reasonable and did not prevent Cañez from impeaching the witness or presenting a defense.  There was no confrontation clause violation.

## IX.  GRUESOME PHOTOGRAPHS

¶65      Cañez argues that the admission of gruesome photographs deprived him of a fair trial and rendered the death penalty unreliable.  We review the admission of potentially inflammatory photographs for clear abuse of discretion.  *State v. Murray*, 184

33

Ariz. 9, 28, 906 P.2d 542, 561 (1995). Relevant photographs will be excluded only if they are inflammatory and the risk of unfair prejudice substantially outweighs their probative value. *State v. Dickens*, 187 Ariz. 1, 18, 926 P.2d 468, 485 (1996); Ariz. R. Evid. 403.

¶66 "[A]ny photograph of the deceased in any murder case is relevant to assist a jury to understand an issue because the fact and cause of death are always relevant in a murder prosecution." *State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (internal quotations and alterations omitted) (quoting *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983)). Cañez' assertion that the photos were probative only of matters not in dispute does not render them irrelevant as the state must carry its burden of proof on uncontested issues as well as contested ones. *Dickens*, 187 Ariz. at 18, 926 P.2d at 485.

¶67 Cañez objected to Exhibit 19, a photograph, on the ground that it was cumulative and its prejudice outweighed its relevance. The court overruled the objection and admitted the photo as evidence of what Hale's son saw upon entering the house. We do not find the photo gruesome or inflammatory. It depicts the body lying on the floor, partially obscured by boxes in a cluttered living room. The victim's shirt is blood-soaked, but neither his head nor face is visible. This photo has little or no tendency to inflame a jury. However, it likewise has little or no probative value

34

since the position of the body was not contested. *Chapple*, 135 Ariz. at 289, 660 P.2d at 1216. Because both the risk of prejudice and the probative value were minimal, the former did not substantially outweigh the latter. The trial court did not abuse its discretion in admitting the photograph.

¶68 Cañez also objected to Exhibit 75 as unduly prejudicial and irrelevant. The state offered the photo on re-direct to show the position of the body as seen by the first officer on the scene. The trial court admitted the photo upon a finding that it was not unduly prejudicial or gruesome. The photo shows the body lying on its side wearing a blood-soaked shirt with the bruised and bloodied left arm partially obscuring the face. We do not find the photo inflammatory or gruesome. Cañez concedes that corroboration of witness testimony is a proper use of photographic evidence, but argues that this photo was not corroborative because the officer testified that it did not accurately depict his recollection of the position of the head. The court recognized this discrepancy but admitted the photo because it depicted the officer's view upon opening the door. Moreover, Cañez' objection went to weight, not admissibility. The photograph was probative to rebut the defendant's attempt to impeach the officer concerning the position of the body. The trial court did not abuse its discretion.

¶69 Cañez also objected to the admission of Exhibits 32, 33, and 34 -- large format head shots taken during the autopsy that

35

depict injuries to the victim's face and head. The state offered them to help the medical examiner in illustrating the wounds, particularly those the doctor would testify were consistent with the attacks described by Patterson. Cañez conceded their relevance but argued that the photographs were unduly inflammatory in light of the fact that the defense did not contest the injuries or the manner in which they were inflicted. The defense argued that the evidence should be presented verbally or by diagram to avoid inflaming the jury. The trial court ruled that the photos were relevant in illustrating the doctor's testimony and that they were not unduly gruesome. These are the most graphic photographs presented, yet we do not find them gruesome or inflammatory. They show the bruises and cuts to Hale's face consistent with the beating described by Patterson, but they are not "unduly disturbing." *Cf. Spreitz*, 190 Ariz. at 142, 945 P.2d at 1273 (finding abuse of discretion in admission of autopsy photos showing decomposition and insect activity on the body); *Chapple*, 135 Ariz. at 287, 660 P.2d at 1214 (finding abuse of discretion in admission of photographs of "burned body, face and skull, the entry wound of the bullet, a close-up of the charred skull with a large bone flap cut away to show the red-colored, burned dura matter on the inside rim of the skull"). Because the photographs' probative value in helping the jury understand the doctor's testimony was not

substantially outweighed by their potential for prejudice, we find no abuse of discretion.

### X.    PURCHASED TESTIMONY

¶70    Cañez argues that the admission of Patterson's and the Ramirezes' testimonies violated his due process rights because the state's plea agreement with Patterson and its alleged efforts to prevent the deportation of the Ramirezes amounted to purchasing testimony in violation of Arizona law and professional ethics. The state first responds that Cañez has waived this suppression argument, including fundamental error review, for failure to make a pretrial motion. However, we will review for fundamental error even absent a pretrial motion to suppress. *See, e.g., State v. Jones*, 185 Ariz. 471, 480-82, 917 P.2d 200, 209-11 (1996) (reviewing admission of evidence for fundamental error despite failure to raise arguments in motion to suppress).

¶71    Cañez contends that the state violated the statutory prohibition on offering, conferring, or agreeing to confer "any benefit upon a witness with the intent to . . . influence the testimony of that person." A.R.S. § 13-2802(A)(1). However, Cañez points to no evidence that the state was attempting to influence the testimony of either Patterson or the Ramirezes. The statute prohibits only conferring benefits in an attempt to influence testimony, not in order to obtain truthful testimony. *See State v. Dumaine*, 162 Ariz. 392, 400-01, 783 P.2d 1184, 1192-93 (1989)

37

(finding that offer of favorable plea agreement did not violate A.R.S. § 13-2802 or rules of professional ethics). The plea agreement did not violate the statute.

¶72      With regard to the Ramirezes' testimony, Cañez alleges that the prosecutor wrote a letter to the INS on their behalf to ensure that they would not be deported, at least until the trial ended. The trial court ordered the letter disclosed, but it is not in the record. However, the record supports the state's characterization of the letter as a mere inquiry into the Ramirezes' immigration status so that the state could seek a deposition if there was a risk of unavailability. Once the state was satisfied that their immigration status was such that deportation was not a concern, it withdrew its motion for depositions. No evidence suggests that the state sought to keep the Ramirezes in this country or to alter their treatment by the INS. Even if it had, nothing suggests that its intent in doing so would have been to influence their testimony. On this record, we conclude the INS letter did not violate the statute.

¶73      Ethical Rule 3.4(b) requires that lawyers "not . . . falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." Ariz. R. Sup. Ct. 42. Here, neither the plea agreement nor the INS letter violated the statute, nor was there any evidence that the

38

prosecutor falsified evidence or sought false testimony. Therefore, we discern no ethical violation.

¶74    Because the state obtained Patterson's and the Ramirezes' testimonies without violating the law or rules of ethics, we find no error in their admission.

**XI.  REASONABLE DOUBT INSTRUCTION**

¶75    Cañez argues that the court's jury instruction on reasonable doubt violated his rights to due process and jury trial by impermissibly lowering the state's burden of proof.  Since Cañez failed to object to the instruction, we will review only for fundamental error.

¶76    The trial court gave the definition of reasonable doubt mandated by this court:  "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt." *State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995).  Cañez contends that "firmly convinced" is more suggestive of the lower clear and convincing standard than it is of the beyond a reasonable doubt standard.  *See State v. King*, 158 Ariz. 419, 423, 763 P.2d 239, 243 (1988) ("[A] 'firm belief or conviction' is truer to the clear and convincing standard . . . .") (citing *State v. Turrentine*, 152 Ariz. 61, 68, 730 P.2d 238, 245 (App. 1986) ("Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the issue sought to be proved.")).  We have

39

previously rejected this argument.  *State v. Van Adams*, 194 Ariz. 408, 418, 984 P.2d 16, 26 ¶29-30 (1999).  We do so once again and thereby reaffirm the *Portillo* instruction.  The trial court did not err.

## SENTENCING ISSUES

**I.**   **CONSTITUTIONAL CHALLENGES TO CAPITAL SENTENCING SCHEME**

### A.   Judicial Finding of Aggravating Circumstances

¶77      Cañez argues that Arizona's capital sentencing scheme violates his constitutional right to trial by jury as interpreted by recent United States Supreme Court precedent.  *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Castillo v. United States*, 530 U.S. 120 (2000); *Jones v. United States*, 526 U.S. 227 (1999).  Whatever the implications of these cases, this court is bound by the Supreme Court's decision upholding Arizona's system of judicial sentencing in capital cases.  *Walton v. Arizona*, 497 U.S. 639 (1990).  For a fuller treatment of the issue, see *State v. Ring*, 200 Ariz. 267, 278-80, 25 P.3d 1139, 1150-52 ¶¶40-44 (2001*),* and *State v. Harrod*, 200 Ariz. 309, 318, 26 P.3d 492, 503 ¶¶40-44 (2001).

### B.   Untimely Notice of Aggravating Circumstances

¶78      Cañez argues that, as a matter of due process, he was entitled to pretrial notice of the aggravating factors upon which the state would rely.  He asserts that this early notice is required in order to afford capital defendants an opportunity to

40

rebut trial evidence which may also be relevant for aggravation. *See* A.R.S. § 13-703(C) (any evidence admitted at trial may be considered at sentencing). We once again reject this argument. *State v. Scott*, 177 Ariz. 131, 141, 865 P.2d 792, 802 (1993); *State v. West*, 176 Ariz. 432, 452-53, 862 P.2d 192, 212-13 (1993), *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 63-64 n.7, 961 P.2d 1006, 1011-12 n.7 ¶¶28-30 (1998); *State v. Richmond*, 136 Ariz. 312, 315-16, 666 P.2d 57, 60-61 (1983); *State v. Ortiz*, 131 Ariz. 195, 207-08, 639 P.2d 1020, 1032-33 (1981), *disapproved on other grounds by State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983). Even if this claim were not foreclosed by our prior decisions, Cañez has failed to explain how the nearly seven months between the state's aggravation disclosure in compliance with Rule 15.1(g), Arizona Rules of Criminal Procedure, and the commencement of his sentencing hearing were insufficient or otherwise prejudicial to his ability to rebut the aggravation. We find no due process violation.

## C. Judicial Finding of Prior Convictions

¶79 Cañez claims that Arizona's sentencing scheme, which provides for jury determinations of prior convictions in non-capital cases but not in capital cases, is arbitrary and capricious in violation of his rights to due process and equal protection under the Fourteenth Amendment. We have expressly rejected this argument. *West*, 176 Ariz. at 454, 862 P.2d at 214. Moreover, the

41

claim fails in its premise since non-capital defendants are no longer statutorily entitled to a jury determination of prior convictions. *See* A.R.S. § 13-604(P); *State v. Quinonez*, 194 Ariz. 18, 20, 976 P.2d 267, 269 (App. 1999) (finding revocation of statutory right to jury trial on prior convictions constitutional).

¶80    In addition, Cañez contends that as an aggravating circumstance, his prior convictions must be proven to a jury. However, whatever the impact of *Apprendi* on *Walton,* it is clear that prior convictions may be found by the court. *Apprendi*, 530 U.S. at 490 ("*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (emphasis added)).

### D.  Victim's Age as Aggravating Circumstance

¶81    Cañez argues that the victim's age is an impermissible aggravating factor because (a) the lives of children and the elderly are not more valuable, (b) the legislature's addition of the aggravator expanded rather than narrowed the reach of the death penalty, and (c) its application double counts the heinous, cruel, or depraved aggravator.  We have upheld the (F)(9) aggravator:

> We find that the age of a victim is an appropriate aggravating factor because a rational basis exists for it. By adopting the (F)(9) factor, the legislature determined that the young and old are especially vulnerable and should be protected.  It is not irrational for the legislature to conclude that murders of children and the elderly are more abhorrent than other

42

> first-degree murders. Thus, in the absence of sufficient
> mitigating factors, murders of this sort should be
> punished more severely. In addition, the age of the
> victim is relevant to an inquiry into the defendant's
> characteristics and propensities. Those who prey on the
> very young or the very old are more dangerous to society.

*State v. Smith*, 193 Ariz. 452, 462, 974 P.2d 431, 441 ¶48 (1999).

¶82        As to double counting, we presume that, even where the fact of the victim's age is used in finding two aggravating factors, trial courts will not count it twice when weighing aggravation against mitigation. *State v. Medina*, 193 Ariz. 504, 512, 975 P.2d 94, 102 ¶25 (1999). Here, however, we need not indulge the presumption since the trial judge explicitly made his heinous, cruel, or depraved finding "without regard to the age of the victim." This aggravating circumstance was not weighed twice.

## II.  STATUTORY AGGRAVATING FACTORS

### A.  Prior Serious Convictions

¶83        Prior convictions of certain enumerated offenses constitute an aggravating circumstance. A.R.S. § 13-703(F)(2), (H)(1). Cañez argues that the state failed to prove his prior convictions at the sentencing hearing. He does not appear to contest the quantum of proof or the fact that his prior offenses qualify as serious under the statute. Instead, he objects that the evidence relied upon was admitted at the trial on prior convictions rather than at the capital sentencing hearing.

43

¶84 Following the jury's guilty verdicts, the court held a bench trial on prior convictions. The prior offenses were demonstrated by the admission, over Cañez' evidentiary objections, of records from the Pima County Superior Court and the Department of Corrections. The state proved by fingerprint and photographic evidence that Cañez was the offender. The court found beyond a reasonable doubt that Cañez had four felony convictions in Pima County Superior Court under CR-12633 and CR-12452 (in which three felonies had been combined for prosecution as a single felony).

¶85 At the capital sentencing hearing, the state sought to question a custodian of records from the Department of Corrections to eliminate Cañez' authentication objection to the DOC records admitted at the prior conviction trial. The judge declined to hear the witness, saying, "if I were wrong before [about the admissibility of the documents], I'm wrong now; if I was right before, I'm right now." This decision also eliminated the need to call an expert to testify that the DOC record fingerprint matched that of Cañez since such testimony had been admitted at the prior convictions trial. The court found beyond a reasonable doubt that Cañez had been convicted of the serious offenses of first degree burglary and aggravated robbery in CR-12452.

¶86 Despite the statutory provision that "[e]vidence admitted at the trial, relating to such aggravating or mitigating circumstances, shall be considered without reintroducing it at the

44

sentencing proceeding," Cañez argues that the same evidence had to be admitted again at the sentencing hearing. A.R.S. § 13-703(C). He contends that the bench trial on prior convictions was not part of the "trial" contemplated by § 13-703, but a hearing solely for proving aggravation of the non-capital offenses under § 13-702. We see no reason to read "trial" in § 13-703 so narrowly. Section 13-703(C) obviates the need for re-introducing for sentencing purposes evidence which has already properly been placed before the court. Cañez' limiting construction of the term "trial" as used in the statute would frustrate the judicial economy objective of the provision without any discernible offsetting gains in accuracy or fairness.

¶87     The only case cited in support of refusing to use trial evidence at sentencing is inapposite. In *State v. Hensley*, the defendant was convicted upon stipulated evidence. 137 Ariz. 80, 89-90, 669 P.2d 58, 67-68 (1983). Because the parties had not intended that the stipulated evidence be used at sentencing, we remanded for a hearing at which the trial court could make findings of fact based upon admissible evidence. *Id.* Here, in contrast, the trial judge made findings of fact supported by evidence properly before the court. Cañez claims to have thought that the evidence of prior convictions admitted at the bench trial on prior convictions would be used only for non-capital sentencing. In light of the language of § 703(C), this was not a reasonable

assumption. Moreover, Cañez had ample opportunity to rebut the prior conviction evidence at the capital sentencing hearing seven months later.

¶88 Cañez also asserts without argument that the trial court erred in admitting the documentary evidence of his prior convictions. This issue may be deemed waived for failure to argue it on appeal. *See State v. Bolton*, 182 Ariz. 290, 298, 896 P.2d 830, 838 (1995). Nevertheless, we note that the DOC record appears to have been properly admitted as a self-authenticating document because it is a public record bearing a signed certification by the department's custodian. Ariz. R. Evid. 902(2), (4). Similarly, the copy of the minute entry reflecting Cañez' convictions bears the seal of the Pima County Superior Court and a signed certification by the clerk of the court that it is a true copy. We find no error in the admission of either document.

## B. Elderly Victim

¶89 It shall be considered an aggravating circumstance where the murder victim was at least 70 years old. A.R.S. § 13-703(F)(9). Cañez argues that the trial court erred in admitting a birth certificate to prove Hale's age and that therefore the state failed to prove this aggravating factor. At the sentencing hearing, Cañez objected that the birth certificate lacked authentication and contained hearsay. The trial court overruled

46

the objection without explanation.  We find it unnecessary to address the admissibility of the birth certificate.

¶90    The victim's age need not be established by documentation, such as a birth certificate or driver's license, but may be proven by the testimony of people who knew him.  *See Medina*, 193 Ariz. at 511, 975 P.2d at 101 ¶23 (upholding finding of victim's age based upon testimony of girlfriend and medical examiner, although the defendant also admitted the age in his sentencing memorandum).  Even without the birth certificate, the uncontradicted evidence amply supports the trial court's finding as to Hale's age.  First, Hale's son testified without objection to Hale's birthday (June 26, 1918) and age (77) as matters of family history.  *See* Ariz. R. Evid. 803(19).  Second, the photographs of Hale admitted at trial corroborated his age.  Third, the coroner testified without objection that the victim's body was consistent with that of a 77-year-old man.  Finally, no evidence contradicted the victim's age.  We agree with the trial court that the state proved beyond a reasonable doubt that Hale was at least 70 years old.

### C.  Pecuniary Gain

¶91    This aggravator requires a finding that "the defendant committed the offense . . . in expectation of the receipt of anything of pecuniary value."  A.R.S. § 13-703(F)(5).  Specifically, the state must prove that pecuniary gain was a

47

"motive, cause, or impetus for the murder and not merely the result." *State v. Kayer*, 194 Ariz. 423, 433, 984 P.2d 31, 41 (1999). This proof may be either by "tangible evidence or strong circumstantial inference." *State v. Hyde*, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996). Here, the record amply supports the trial court's findings "that the offense was motivated by the desire for pecuniary gain and the objective was robbery of the victim; that the death occurred in the course of and in furtherance of the defendant's efforts to obtain the victim's property."

¶92    The evidence supports, and Cañez does not dispute, the trial court's conclusion that the robbery was motivated by Cañez' desire to get money for drugs. Yet Cañez contends that while the robbery may have been motivated by pecuniary gain, the murder was not. He attempts to distinguish the motive for the assaults from the motive for the murder, arguing that because he did not intend or need to kill in order to effect the robbery, pecuniary gain was not a motive for the murder. Under this reasoning, because the murder was assertedly not contemplated, it had no motive at all and hence does not qualify for (F)(5) aggravation. Given the quantity and quality of wounds inflicted, we find patently absurd the claim that this victim's death was unintentional.

¶93    More importantly, pecuniary gain aggravation does not require a motive to kill. Aggravation under this factor may also be based upon a causal connection between the pecuniary gain

48

objective and the killing. *Kayer*, 194 Ariz. at 433, 984 P.2d at 41 (holding that (F)(5) aggravation is established where pecuniary gain was a "cause" of the murder). Thus, we have upheld the pecuniary gain factor even where the killing may have been unintentional. *State v. Harding*, 141 Ariz. 492, 500, 687 P.2d 1247, 1255 (1984) (upholding pecuniary gain factor where robbery victim asphyxiated as a result of binding and gagging). Neither does the fact that a killing is not necessary to effectuating the underlying robbery preclude a pecuniary gain aggravation. *State v. Comer*, 165 Ariz. 413, 429, 799 P.2d 333, 349 (1990). "When the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant." *State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987). Thus, the state need not prove the defendant intended beforehand to kill as well as rob. *Id.* at 35-36, 734 P.2d at 577-78.

¶94    We recognize that "[a] murder committed in the context of a robbery or burglary is not *per se* motivated by pecuniary gain." *State v. Sansing*, 200 Ariz. 347, 353, 26 P.3d 1118, 1124 ¶13 (2001). Nevertheless, killing the victim and sole witness of a robbery is powerful circumstantial evidence of an intent to facilitate escape or hinder detection and thus advance the underlying pecuniary gain objective. *See, e.g., State v. Hoskins,* 199 Ariz. 127, 147, 14 P.3d 997, 1017 ¶87 (2000) ("When a robbery victim is executed to facilitate the killer's escape and hinder

49

detection for the purpose of successfully procuring something of value, the pecuniary gain motive is present."); *State v. Rockwell*, 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989) (even if committed after property had been taken, "the murder was part and parcel of the robbery because it resulted in eliminating the only witness to the crime."); *State v. Correll*, 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986) (finding pecuniary gain aggravation where "the murders were part of the overall scheme of the robbery with the specific purpose to facilitate the robber's escape."). The inference is particularly strong in cases, like this one, where the defendant made no attempt to cover his face or otherwise conceal his identity from the victim. *State v. Greenway*, 170 Ariz. 155, 165, 823 P.2d 22, 32 (1991) (finding pecuniary gain motive for murder of robbery victim where defendant committed home invasion robbery without attempting to cover his face despite knowing victims were inside).

¶95 We can conceive no nonpecuniary reason for Cañez to kill this victim. Cañez assaulted Hale in order to secure his property, and Hale's death facilitated Cañez' escape and hindered detection of the robbery. Hale's death was therefore directly caused by Cañez' desire for pecuniary gain and cannot be described as accidental or unexpected such that (F)(5) aggravation might be inappropriate. *See State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) ("[A] significant consideration is whether the

killing was part of an overall robbery scheme, as opposed to being unexpected or accidental.").

¶96     This is not a case in which the robbery and murder can be characterized as separate events for (F)(5) purposes. *Sansing*, 200 Ariz. at 353-54, 26 P.3d at 1126-27 ¶22 (finding murder committed at least an hour after robbery a separate event). Where, as here, the killing and robbery take place almost simultaneously, we will not attempt to divine the evolution of the defendant's motive in order to discern when, or if, his reason for harming the victim shifted from pecuniary gain to personal "amusement" or some other speculative nonpecuniary drive. *Medina*, 193 Ariz. at 513, 975 P.2d at 103 ¶31 (finding causal relationship between pecuniary gain motive and murder attenuated by fact that killing was "removed in time and place" from robbery) (quoting *State v. Rinehardt*, 190 Ariz. 579, 591, 951 P.2d 454, 466 (1997)).

¶97     We find beyond a reasonable doubt that Cañez' desire for pecuniary gain was a direct and immediate cause of the murder. The trial court correctly found (F)(5) aggravation.

¶98     Cañez also argues that pecuniary gain was double counted because it was both an aggravating factor of the felony murder and an element of the underlying armed robbery. We have long since rejected this argument because the pecuniary gain aggravator requires factual findings apart from the elements of robbery. *State v. Carriger*, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984).

51

### D. Especially Cruel, Heinous, or Depraved Offense

¶99 Aggravation will be found where the offense was committed in "an especially heinous, cruel or depraved manner." A.R.S. § 13-703(F)(6). Any one of the three elements will establish (F)(6) aggravation. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983). Here, the trial court found the offense cruel as well as heinous or depraved. On independent review, we find (F)(6) aggravation established beyond a reasonable doubt due to the cruelty of the attack.

### 1. Especially Cruel

¶100 The cruelty factor goes to the mental and physical anguish suffered by the victim. *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980). Therefore, the victim must be conscious for at least some of the wounds inflicted. *State v. Lopez*, 163 Ariz. 108, 114-15, 786 P.2d 959, 965-66 (1990). The state must also show that the defendant knew or should have known that the victim would suffer. *Trostle*, 191 Ariz. at 18, 951 P.2d at 883. Here, the court found that Hale was conscious at the time of the initial stabbing and remained at least partially conscious through the attempted strangulation and beating. The court therefore concluded that Cañez "caused the victim pain and agony for a sufficient period of time to constitute cruelty as defined by law."

¶101 On appeal, the state concedes that the evidence does not support the trial court's conclusion that the stab wounds preceded the beating. Although in its closing argument the state argued that the stabbing preceded the beating, the state now contends that the evidence strongly suggests the stabbing came last. In either event, the state believes the evidence supports the court's finding of mental and physical anguish. To demonstrate that Hale was conscious throughout the robbery, the state offers the following chronology based on Patterson's testimony.

¶102 Cañez knocked on the door and forced his way in. From outside, Patterson could hear a struggle. Cañez then opened the door and told him to come in. As Patterson entered, he stepped over Hale's "squirming" body. When Patterson returned from loading a television into the truck, he found Cañez strangling Hale with a white cloth. Patterson turned to leave, but Cañez came to the door and ordered him back in. When Patterson re-entered the house, he saw Hale still moving on the ground. He also saw a folding knife on a stand next to a chair (the police later found an open folding knife, with a tiny amount of species-indeterminate blood on it, lying on the chair). Patterson next saw Cañez strike Hale with his fist and a frying pan. As Patterson left for the last time carrying the stereo speakers, he stepped over Hale, who was raising his right arm toward his head. The medical examiner testified that this motion suggests Hale was conscious enough to feel pain in his

53

head. The medical examiner also testified that one of the stab wounds was a defensive injury, indicating consciousness.

¶103 Cañez argues that the evidence does not prove beyond a reasonable doubt that Hale remained conscious during the attack. The medical examiner could not determine the order in which the injuries were inflicted and testified that any of the ten blunt force injuries to the head could have resulted in immediate unconsciousness. Thus, Cañez argues that Hale may have been unconscious from the first blow. In the alternative, Cañez notes that the medical examiner also testified that one of the stab wounds would have rendered Hale unconscious. Therefore, Cañez concludes that whatever the order of injuries, Hale was probably unconscious soon after attacks began. However, Patterson reported seeing Hale moving at several points throughout the robbery. Thus, whatever the sequence of attacks, the evidence demonstrates that they did not result in sustained unconsciousness.

¶104 We concur with the trial court's especial cruelty ruling. This is not a case in which cruelty cannot be established because one course of events consistent with consciousness is as likely as another suggesting unconsciousness. *See State v. Bolton*, 182 Ariz. 290, 311, 896 P.2d 830, 851 (1995) (noting that a finding of especial cruelty is precluded by inconclusive evidence of consciousness). Patterson's uncontroverted testimony indicates that Hale was conscious throughout the robbery and assaults. This

54

is not a case in which the injuries were inflicted in quick succession such that the victim had no opportunity to suffer or contemplate his fate. *Cf. State v. Soto-Fong*, 187 Ariz. 186, 203-04, 928 P.2d 610, 627-28 (1996). Instead, Cañez' assaults were punctuated by his removing property to the truck and ordering Patterson to help in the theft. Finally, Cañez' assertion that Hale's suffering did not constitute cruelty because it was not intended or foreseeable is facially untenable. *Cf. State v. Smith*, 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985) (finding no cruelty because gunshot to the head could not reasonably be foreseen to cause suffering). The state has carried its burden of proving especial cruelty beyond a reasonable doubt.

## 2. Especially Heinous or Depraved

¶105 The trial court implicitly found the offense heinous or depraved because the repeated attacks on the victim were unnecessary to accomplishing the robbery, the victim was attacked after he was rendered helpless, and the violence was gratuitous. These findings are recognized factors for establishing heinousness or depravity. *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11. However, heinousness or depravity aggravation must stand or fall with a gratuitous violence finding because a showing of helplessness and senselessness, without more, is not, as a matter of law, sufficiently aggravating. *Trostle*, 191 Ariz. at 18, 951 P.2d at 883.

55

¶106    Violence beyond that necessary to kill is gratuitous. *Rinehardt*, 190 Ariz. at 590, 951 P.2d at 465.   Here, Cañez attempted to strangle Hale, stabbed him six times, and delivered 21 blunt force injuries, ten of them to the head.   He attacked Hale with his fist, a frying pan, a laundry bag, and a knife.   Cañez argues that this violence was not grossly in excess of that required to kill.   This point is valid in light of the state's contention that the stabbing came last.   On this interpretation of the evidence, Cañez merely escalated his attacks until he succeeded in killing Hale.   Therefore, we cannot find beyond a reasonable doubt that the violence exceeded that necessary to kill.

¶107    The trial court held the killing senseless because it was unnecessary to the robbery.   We agree.   After incapacitating Hale in the initial attack, Cañez could easily have removed the property.   He argues, without merit, that the killing cannot have been both senseless and motivated by pecuniary gain.   A murder is senseless when unnecessary to the defendant's criminal purpose. *State v. Lee*, 189 Ariz. 608, 619, 944 P.2d 1222, 1233 (1997).   The purpose here was to take Hale's property.   Thus, there is no inconsistency between the pecuniary gain objective and the senselessness of the killing.

¶108    The trial court also found that the victim was helpless. We agree.   Helplessness is present when the victim is unable to resist.   *Hyde*, 186 Ariz. at 281, 921 P.2d at 684 (finding

56

helplessness where elderly victims had been subdued prior to most vicious attacks).  Here, the initial assault rendered Hale incapable of resistance.  The mere presence of a defensive stab wound does not show that the victim was capable of resisting.  *See State v. Miller*, 186 Ariz. 314, 324, 921 P.2d 1151, 1161 (1996) (attempt to resist does not preclude finding of helplessness).

¶109    Although we agree that the victim was helpless and the killing senseless, these factors alone are not enough. Accordingly, we cannot concur in the trial court's finding of heinousness or depravity.  The defendant's state of mind simply does not rise to that level on this record.  *See Trostle*.  We therefore conclude that evidence is not sufficient to justify a finding of heinousness or depravity as an aggravating circumstance.

## III. MITIGATING CIRCUMSTANCES

¶110    The sentencing court must "consider as mitigating circumstances any factors . . . which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense."  A.R.S. § 703(G); *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  However, "it is not required to find that evidence to be mitigating.  If it does find that the evidence is mitigating, the weight to be given that evidence is within its discretion."  *State v. Gonzales*, 181 Ariz. 502, 515, 892 P.2d 838, 851 (1995).  The defendant bears the burden of proving

57

mitigation circumstances by a preponderance of the evidence. *State v. McMurtrey*, 143 Ariz. 71, 72-73, 691 P.2d 1099, 1100-01 (1984).

## A. Statutory Mitigation

¶111    Arizona's capital sentencing statute provides that it shall be a mitigating factor if the "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired." A.R.S. § 13-703(G)(1).  This was the only statutory mitigation advanced at trial or on appeal.  Cañez argues that the trial court erred in finding that he was not "significantly impaired."  In support of this factor, Cañez points to evidence that he was mentally retarded, was taking medication for seizures, suffered a depressive disorder, had little education, was illiterate, exhibited symptoms of brain damage, was probably a drug addict, and was intoxicated at the time of the offense.

¶112    Cañez' primary contention is that his intoxication and/or craving for drugs at the time of the murder was enough to establish (G)(1) mitigation.  Although Cañez was using crack cocaine the night of the murder, there was no evidence of his degree of intoxication nor "that it overwhelmed his ability to control his physical behavior." *State v. Stanley*, 167 Ariz. 519, 530-31, 809 P.2d 944, 955-56 (1991) (upholding finding of no (G)(1) mitigation and contrasting with *State v. Rossi II*, 154 Ariz. 245, 250-51, 741 P.2d 1223, 1228-29 (1987), in which there was uncontroverted expert

58

testimony that defendant's addiction was so great that his "whole personality began to evolve around the use of cocaine"). Here, Cañez was in control of himself to the extent that he drove away from the scene of the crime with his headlights turned off and went home to clean up and change clothes after selling Hale's property. *See Rinehardt*, 190 Ariz. at 591-92, 951 P.2d at 466-67.

¶113 The evidence of brain damage, mental illness, and retardation was conflicting. Three psychological experts evaluated Cañez. First, Cañez' psychological expert, Dr. Tatro, examined him on June 10, 1998. He diagnosed borderline personality disorder with antisocial features, intermittent explosive personality disorder, depressive disorder recurrent, and possible organic brain syndrome. Next, on referral by Tatro, Dr. Blackwood examined Cañez specifically for neuropsychological problems (brain damage or dysfunction) on July 21, 1998. His finding of indications of organic brain damage was qualified due to suggestions that Cañez may not have been trying at the tests. Finally, the state's psychological expert, Dr. Youngjohn, evaluated Cañez on August 6, 1998. Youngjohn found no evidence of mental illness or brain damage, but diagnosed antisocial personality disorder and the closely related psychopathic personality disorder. He found Cañez a dangerous person who is likely to re-offend. Youngjohn also testified that his, Blackwood's, and Tatro's testings all indicated that Cañez was probably "faking it" to exaggerate symptoms. Tatro

did not test for malingering, but, based upon his clinical interview, he opined that Cañez was trying as hard as he could. Youngjohn determined that when Cañez' intelligence, as tested by both Tatro and himself, was adjusted for socioeconomic background, it fell within the average range. Tatro did not deem such an adjustment necessary.

¶114    "The trial judge has broad discretion in determining the weight and credibility given to mental health evidence." *State v. Doerr*, 193 Ariz. 56, 69, 969 P.2d 1168, 1181 ¶64 (1998). On independent review, we accord great deference to the trial court's conclusions because the "trial judge is in the best position to evaluate credibility and accuracy, as well as draw inferences, weigh, and balance." *Hoskins*, 199 Ariz. at 149, 14 P.3d at 1019 ¶97 (internal quotations omitted) (quoting *State v. Bible*, 175 Ariz. 549, 609, 858 P.2d 1152, 1212 (1993)). Presented with conflicting psychological evidence, the trial court credited Youngjohn, who agreed with Tatro's antisocial personality disorder diagnosis but not his borderline personality disorder diagnosis. In any event, both personality disorders are insufficient to establish (G)(1) mitigation. *See Hoskins*, 199 Ariz. at 149, 14 P.3d at 1019 ¶96 (agreeing with trial court that antisocial and borderline personality disorders are conduct disorders not sufficient to establish (G)(1) mitigation). Moreover, despite any psychological problems, the evidence demonstrates that Cañez

60

understood the wrongfulness of his conduct. We agree with the trial court's conclusion that this statutory mitigating factor is not present because Cañez was not significantly impaired.

### B. Non-Statutory Mitigation

¶115    Cañez argues that the trial court improperly rejected each of his proposed bases for non-statutory mitigation.

#### 1. Drug and Alcohol Use

¶116    The court found that though Cañez was somewhat impaired, there was not "a sufficient connection between the use of alcohol or drugs and the offense for this to constitute a sufficiently mitigating factor." Cañez argues that his impairment due to intoxication, even if not sufficient for statutory mitigation, should be considered. However, a causal nexus between the intoxication and the offense is required to establish non-statutory impairment mitigation. *Kayer*, 194 Ariz. at 438, 984 P.2d at 46 ¶54. Cañez offered no evidence of the degree of his intoxication, its connection with his actions, or any resulting impairment. A possibility of impairment will not suffice. *Id.* We agree with the trial court that this factor is, at best, minimally mitigating.

#### 2. Felony Murder

¶117    The court found the felony murder conviction not a "sufficiently mitigating circumstance" because it determined beyond a reasonable doubt that Cañez personally killed Hale and that his conduct was intentional. Contrary to Cañez' assertion, this

61

finding is clearly supported by the evidence. A conviction for felony murder is not mitigating when, as here, the "defendant intended to kill or knew with substantial certainty that his action would cause death." *West*, 176 Ariz. at 450, 862 P.2d at 210 (internal quotations and alterations omitted). We find the felony murder conviction not mitigating.

### 3. Defendant's Good Character

¶118 The court found that Cañez had not proven his good character by a preponderance of the evidence. Cañez contends that this factor was dismissed out of hand. However, he points to no evidence in support of his alleged good character. To the contrary, his prior convictions argue against a finding of good character. *See Gonzales*, 181 Ariz. at 515, 892 P.2d at 851. We find this factor unproven.

### 4. Traumatic Childhood and Dysfunctional Family

¶119 The trial court acknowledged that Cañez had endured "violence, suicide, mental illness, and poverty" as a child, but determined that these experiences were "not sufficiently connected to his conduct at the time of the offense to constitute a substantial relevant mitigating circumstance." A defendant's difficult childhood is mitigating only where causally connected to his offense. *State v. Clabourne II*, 194 Ariz. 379, 387, 983 P.2d 748, 756 ¶35 (1999). Tatro suggested that Cañez may have killed this elderly victim out of displaced rage toward his abusive

62

parents.[1] However, such a tenuous, speculative nexus is insufficient to constitute significant mitigation. *See Hoskins*, 199 Ariz. at 151-52, 14 P.3d at 1021-22 ¶¶113, 115. We find this factor unproven.

### 5. Defendant's Love of Family

¶120 The trial court found that Cañez had loving relationships with family members but did not find this fact a "substantial relevant mitigating circumstance." Loving family relationships are mitigating. *Trostle*, 191 Ariz. at 22, 951 P.2d at 887. However, like the trial court, we find that this factor carries little weight.

### 6. Mental Illness or Impairment

¶121 The court found that Cañez had a personality disorder and low average intelligence or borderline mental retardation.[2] Nevertheless, the court found that Cañez possessed "sufficient intelligence to make reasonable judgments regarding his conduct." Neither his personality disorder nor his intelligence were judged a "sufficiently mitigating factor to call for leniency." The trial

---

[1] Among other things, as the sixth of nine children, Cañez was frequently chained by his hands to a table or bed when he misbehaved, began using marijuana at age 7, began using heroin at age 13, witnessed his father attempt suicide with a knife, and saw substantial intra-family violence, including shootings.

[2] Mitigation evidence showed a family history of epilepsy and mental health problems, including the suicides of Cañez' father and brother. Cañez reportedly attempted suicide three times while a teenager.

63

court heard expert testimony that Cañez' personality disorder(s) may have led him to impulsive, explosive, or psychotic reactions when under stress. However, this fact is entitled to little weight since Cañez brought the stress upon himself by electing to commit the robbery.

¶122    "[T]he weight to be given mental impairment should be proportional to a defendant's ability to conform or appreciate the wrongfulness of his conduct." *Trostle*, 191 Ariz. at 21, 951 P.2d at 886. Here, this factor is entitled to little weight because, as noted in our (G)(1) discussion, the court found, and the evidence demonstrates, that Cañez appreciated the wrongfulness of his conduct. Moreover, Cañez has failed to establish a causal link between any propensity to lose control and the robbery which he had in mind for at least several hours before carrying it out. *See Kayer*, 194 Ariz. at 438, 984 P.2d at 46 ¶54 (causal nexus between mental disorder and crime required for mitigation). We agree with the trial court that this factor is insufficient to call for leniency.

### 7.   Defendant's Good Conduct in Court

¶123    The court found defendant's conduct, though appropriate, not a relevant mitigating factor. We agree. *See Trostle*, 191 Ariz. at 22, 951 P.2d at 887.

### 8.   Disparate Sentence of Co-Defendant

¶124    "A disparity in sentences between co-defendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity." *Kayer*, 194 Ariz. at 439, 984 P.2d at 47 ¶¶57-58.  Here, Patterson, Cañez' co-defendant, received a sentence of only ten years.  The court did not find this fact mitigating because Patterson's lesser sentence was justified by his minor "participation in the offense, his lack of any prior record, his cooperation with law enforcement and his agreement to testify."  In contrast, Cañez has a substantial criminal record, lied to the police, and was found to be the only killer.  The trial court correctly found the disparity in this case reasonable and hence not mitigating.  *See Kayer*, 194 Ariz. at 439, 984 P.2d at 47 ¶¶57-58 (no sentence disparity mitigation where co-defendant entered plea agreement, provided evidence, and was not the actual killer).

### 9.   Cumulative Mitigation

¶125    Cañez also contends that because each factor was rejected individually, the court improperly failed to consider their cumulative effect.  However, in its Special Verdict the trial court explicitly held that "the cumulative effect of all of the mitigation offered by the defendant . . . is not sufficiently substantial to call for leniency."

## IV.   INDEPENDENT REWEIGHING

¶126    We re-weigh all factors, both aggravating and mitigating. In light of the four statutory aggravating circumstances established beyond a reasonable doubt, the absence of statutory mitigation, and the minimal weight of the non-statutory mitigating circumstances, we independently conclude that the mitigating circumstances are insufficient to call for leniency.  In reaching this conclusion, we are aware that our decision today removes the depravity and heinousness component of (F)(6).  Even with that removal, however, the remaining (F)(6) cruelty finding, particularly when coupled with the other aggravators, carries sufficient weight to uphold the defendant's sentence.

¶127    Although Cañez does not raise the issue on appeal, we note that because the trial court found, and we agree, that Cañez personally killed Hale, *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), are satisfied.

**CONSTITUTIONAL CLAIMS RAISED TO PREVENT FEDERAL PRECLUSION**

¶128    1.   The death penalty is *per se* cruel and unusual punishment.  Rejected by *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

¶129    2.   Execution by lethal injection is cruel and unusual punishment.  Rejected by *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

66

¶130    3. The statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. Rejected by *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

¶131    4. The death statute is unconstitutional for its failure to permit defendants to "death qualify" the sentencing judge. Rejected by *State v. West*, 176 Ariz. 432, 454-55, 862 P.2d 192, 214-15 (1993), *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 63-64 n.7, 961 P.2d 1006, 1011-12 n.7 ¶¶28-30 (1998).

¶132    5. The death statute is unconstitutional because it fails to guide the sentencing court. Rejected by *State v. Van Adams*, 194 Ariz. 408, 422, 984 P.2d 16, 30 ¶55 (1999).

¶133    6. Arizona's death statute unconstitutionally requires defendants to prove that their lives should be spared. Rejected by *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

¶134    7. The statute unconstitutionally fails to require either cumulative consideration of multiple aggravating factors or that the trial court make specific findings as to each mitigating factor. Rejected by *Van Adams*, 194 Ariz. at 422, 984 P.2d at 30 ¶55.

¶135    8. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. Rejected by *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

¶**136**     9.   The mitigation statute is unconstitutional because there are no statutory standards for weighing.  Rejected by *State v. Atwood*, 171 Ariz. 576, 645-46 n.21, 832 P.2d 593, 662-63 n.21 (1992), *disapproved on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241, 25 P.3d 717, 729 ¶25 (2001).

¶**137**     10.  Arizona's capital sentencing statute insufficiently channels the sentencer's discretion in imposing death sentences.  Rejected by *West*, 176 Ariz. at 454, 862 P.2d at 214.

¶**138**     11.   Arizona's  death  statute  is  unconstitutionally defective because it fails to require the state to prove that death is appropriate.  Rejected by *State v. Gulbrandson*, 184 Ariz. 46, 72, 906 P.2d 579, 605 (1995).

¶**139**     12.   The  prosecutor's  discretion  to  seek  the  death penalty unconstitutionally lacks standards.  Similar claim rejected by *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

¶**140**     13.   Arizona's  death  sentence  has  been  applied arbitrarily and in a discriminatory manner against impoverished males  whose  victims  have  been  Caucasian.   Discriminatory application claim rejected by *West*, 176 Ariz. at 455, 862 P.2d at 215.  Arbitrary application claim rejected by *State v. Lee*, 185 Ariz. 549, 553, 917 P.2d 692, 696 (1996).

¶**141**     14.  The constitution requires proportionality review of a defendant's death sentence.  Rejected by *Salazar*, 173 Ariz. at 416, 844 P.2d at 583.

¶142    15.    There is no meaningful distinction between capital and non-capital cases.  Rejected by *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

## CONCLUSION

¶143    For the reasons set forth, we reverse the conviction of one count of armed robbery and affirm all remaining convictions and sentences.

_____
                              Charles E. Jones
                              Chief Justice

CONCURRING:


_____
Ruth V. McGregor, Vice Chief Justice


_____
Stanley G. Feldman, Justice


_____
Thomas A. Zlaket, Justice